IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATE OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br>MARK PHILLIP CARTER II,<br>Defendant. | Criminal No. 4:18-CR-053<br><br>DEFENDANT'S SENTENCING<br>MEMORANDUM |

COMES NOW, the Defendant, Mark Phillip Carter II, by and through counsel, and submits the following in advance of sentencing in this matter.

The Court is asked at this sentencing hearing to determine the correct guidelines, and then the appropriate sentence. There is a mandatory minimum of 10 years, which will impact whether or not all of the guideline issues actually end up affecting the final sentencing range.

The defense believes that the government will be submitting that the following guideline calculation is appropriate:[1]

Base Level 30

+2 for undue influence under 2G1.3(b)(2)(B)

+2 for sex act under 2G1.3(b)(4)(A)

+3 for total units (+1 current offense, + 1 victim 1, +1 victim 2)

-3 for acceptance of responsibility.

Final Offense Level of 34, Category I, guideline range of 151-188.

The defendant submits that the following guideline calculation is appropriate:

Base Level 30

---

[1] Based on conversations with the AUSA, defense counsel believes this will be the government's position at sentencing.

1

No adjustments under 2G1.3(b)(2)(B) or 2G1.3(b)(4)(A)

Grouping for Victims 1-3 under the Travel Act for no increase for grouping

-3 for acceptance of responsibility

Final Offense Level of 27, Category I, guideline range of 70-87 months, but with a mandatory minimum of 120 months.

## I.     ISSUES WHICH AFFECT THE GUIDELINES.

## A.   THE TWO-LEVEL INCREASE FROM USSG § 2G1.3(b)(2)(B) SHOULD NOT APPLY BECAUSE CARTER DID NOT UNDULY INFLUENCE VICTIM A.

Carter objects to the 2 levels applied under 2G1.3(b)(2)(B) and submits that he did not unduly influence Victim A.

Victim A had engaged in prostitution on her own before Carter got involved with her. Minor Victim A also engaged in prostitution at times without Carter's involvement and helped arrange for other women to engage in prostitution herself, without Carter's involvement.

Victim A used a false id that indicated she was over 18, which she used to buy herself alcohol.  She did not go to school on a daily basis.  She misrepresented to others what her age was.  Carter was not involved whatsoever in Victim A securing, or using, a fake id.

Victim A was 16 - 17 years old during the time of the offense (2016-2017). She turned 18 in August of 2018 after Carter was in custody.  Carter is 9 years older than Victim A.  He was 25-26 years old during the commission of the offense and turned 27 in October of 2018 after he was in custody.  Victim A did not cooperate with authorities, and does not appear to have testified at any point in these proceedings.  She has not made these assertions about Carter that are attributed to him, others have made those assertions.

These facts do not satisfy the conditions for the undue influence adjustment as set out in Application Note 3(B) to USSG § 2G1.3.  First, Carter was not 10 years older than Victim A, so

there is no presumption that the adjustment applies. And second, Carter did not have influence over Victim A to the degree that it compromised the voluntariness of her behavior.

In *United States v. Hagen*, the Eighth Circuit addressed the question of whether or not a defendant should be given the two level increase for undue influence. *United States v. Hagen*, 641 F.3d 268, 270–71 (8th Cir. 2011). In *Hagen*, the defendant was 13 years older than the victim, was dating the victim's mother, and the victim was thirteen years old, "immature", "shy" and "naïve." In finding the adjustment appropriate after applying the presumption, the court explained:

> Section 2G1.3(b)(2)(B) of the sentencing guidelines instructs the court to add two levels if the defendant "unduly influenced a minor to engage in prohibited sexual conduct." The application notes counsel that "the court should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior." § 2G1.3 cmt. n. 3(B). Moreover, the application notes provide that where, as here, the defendant is at least ten years older than the minor victim, there is a rebuttable presumption that the enhancement applies. *Id.* The district court found that Hagen had not rebutted the presumption that the enhancement applied and that, on the contrary, the evidence supported the application of the enhancement. …
>
> The district court did not clearly err in finding that Hagen unduly influenced N.M. to engage in sexual conduct. As the district court found, N.M. was "immature, shy, without worldly skills, [and] naive," which made her subject to the influence of a man who was thirteen years older than her and in a relationship with her mother. Hagen developed his sexual abuse of N.M. gradually, beginning by fondling her breasts and vagina while she slept and only later progressing to more invasive sexual contact. *See United States v. Lay,* 583 F.3d 436, 445 (6th Cir.2009) (upholding the undue influence enhancement \*271 because the district court "found facts that are consistent with a manipulative adult's building a relationship with a minor for the purpose of eventual sexual activity"). Later, he transported N.M. six hours away from her home and engaged in sexual intercourse with her, telling her to conceal the encounter from her mother. *See United States v. Castellon,* 213 Fed.Appx. 732, 738 (10th Cir.2007) (unpublished) (relying on the fact that the defendant "drove [the victim] all the way from Albuquerque to Mexico for [sexual] liaisons, all while she had no money and no identification" in affirming the district court's application of the undue influence enhancement). During at least one sexual encounter, Hagen engaged in forceful sexual intercourse with N.M. that caused her internal injury. Based on this evidence of undue influence, we are unpersuaded by Hagen's protestations that his

> mental health and learning deficiencies undermine the district court's determination that his influence over N.M. compromised the voluntariness of her behavior. Nor does Hagen's bare assertion that "[t]he victim traveled freely with defendant and had a months-long consensual sexual relationship with him" rebut the presumption that the section 2G1.3(b)(2)(B) enhancement applies. *See United States v. Brooks,* 610 F.3d 1186, 1199 (9th Cir.2010) ("[T]he victim's willingness to engage in sexual activity is irrelevant [to the § 2G1.3(b)(2)(B) inquiry], in much the same way that a minor's consent to sexual activity does not mitigate the offense of statutory rape or child molestation." (quoting *United States v. Dhingra,* 371 F.3d 557, 567–68 (9th Cir.2004))).

*Hagen*, 641 F.3d at 270–71.

Unlike in Hagen, Carter was not involved in a relationship with Victim A's mother and was not in a parental role towards Victim A. Instead, Carter was personal friends with Victim A, had her over to his house, introduced her to his mother, and otherwise hung out with her regularly as equals, not as a parental figure. Victim A was not shy, was not naïve, and was not 13. Instead Victim A was outspoken, mature, worldly, and 16-17 years old.

This case is more akin to the facts in *United States v. Myers*, 481 F.3d 1107 (8th Cir. 2007) and *United States v. Calvo*, 596 Fed.Appx. 541 (9th Cir. 2015) (unpublished). In *Myers*, the district court, Judge Bennett from the Northern District of Iowa, refused to apply the undue influence adjustment despite the presumption having been triggered by the differences in age because the minor victim in the case had willingly participated in the sexual acts with the defendant, and had previously contemplated running away with another man before running away with the defendant. *Myers*, 481 F.3d at 1109. Similarly here Victim A voluntarily participated in prostitution, arranged some of her own calls, arranged calls for other women, and had been engaged in prostitution prior to Carter. And, here, there is no presumption for Carter to rebut like there was in *Myers*.

In *Calvo*, the Ninth Circuit reversed a district court's finding of undue influence of a minor because the defendant had rebutted the presumption by showing that the victim was

predisposed to engage in the conduct at issue and voluntarily consented to it. *Calvo*, 596 Fed. Appx. 541, *543. Here, Carter does not have to rebut any presumption and Victim A was predisposed to the conduct at issue, indicating that the 2 levels should not be applied.

The facts here do not support the 2 level adjustment for undue influence.

### B. THE TWO-LEVEL INCREASE FROM USSG 2G1.3(b)(4)(A) SHOULD NOT APPLY .

Perhaps a closer question is whether or not two levels should be applied under section 2G1.3(b)(4)(A). There is no factual dispute that Victim A engaged in multiple commercial sex acts during this time frame. Instead, the issue for the court is whether commercial sex acts result in a 2-level increase under this guideline when the guideline applies section (a)(2), rather than (a)(3) or (a)(4).

The guideline's language is somewhat unclear. The guideline reads,

> If (A) the offense involved the commission of a sex act or sexual contact; or (B) subsection (a)(3) or (a)(4) applies and the offense involved a commercial sex act, increase by **2** levels.

On its face, the guideline seems to infer that commercial sex acts only count if subsections (a)(3) or (a)(4) are applied. Of course, the obvious argument, and perhaps the correct one, made by the government is that a commercial sex act by definition must also be a "sex act" as used in the first part of the guideline. But if that's the case, why then did the Sentencing Commission include both subparts of the guideline? It would have been sufficient to just have the guideline read ,"if a sex act occurred add 2 levels" for the same result to occur as under the government's reading of the subsection. And, the government's next logical argument that any sex acts, including commercial ones, provide for 2 levels under sections (a)(1) and (a)(2), but only commercial sex acts result in the 2 levels under sections (a)(3) and (a)(4) is also not supported by the plain language of the guideline because there is nothing that limits the first

5

clause of "sex acts" to only sections (a)(1) and (a)(2). Essentially, the government's reading of the guideline results in a meaning that is "any sex act including commercial sex acts result in 2 level increases for all offenses, but also commercial sex acts result in 2 level increases for some of the offenses." It simply does not make sense.

What makes more logical sense is that the wrongful, illegal conduct has to involve sex acts between the defendant and the victim in order to get the 2 levels under (a)(1) and (a)(2), or there has to be a commercial sex act under (a)(3) and (a)(4) for the enhancement to apply. *But see, United States v. Basa*, 817 F.3d 645 (9th Cir. 2016) (Holding as a matter of first impression that the defendant need not be the one who himself has the illegal sexual contact with the victim for the 2 level adjustment to apply). If, however, *Basa* is incorrect, and the guideline is meant to apply only to those cases where the defendant himself has the illegal sexual contact with the victim, then the two levels would not apply in the instant case.

This argument, however, appears to not be in line with cases where circuit courts have upheld the 2 level increase for commercial sex acts despite (a)(1) or (a)(2) applying. None of these cases, however, appear to have been asked to address the issue of whether the statute intends commercial sex acts to only apply to (a)(3) or (a)(4) cases, and instead all address other arguments, such as whether or not the guideline results in impermissible double counting. As such, the argument appears to still be open that commercial sex acts do not trigger the 2 level enhancement for those cases who fall under (a)(1) or (a)(2) of the guideline. *See, e.g.*, *United States v. Hornbuckle*, 784 F.3d 549 (9th Cir. 2015) (upholding application of 2 levels under 2G1.3(b)(4)(A) in an 18 USC 1591 case, finding the guideline did not constitute impermissible double counting); *United States v. Willoughby*, 742 F.3d 229 (6th Cir. 2014) (finding no double counting in the guideline and statute because sex act was not an element of the offense.) And so,

despite these cases, the defense submits that the 2 levels should not be applied in this case.

### C. THE TRAVEL ACT, NOT 18 USC 1594(c) SHOULD APPLY FOR GROUPING PURPOSES.

The government has objected to the presentence report not attributing a greater offense conduct for Victims 1, 2 and 3,[2] arguing that Carter should be held responsible for violations of 18 USC 1594(c), rather than the admitted violations of the Travel Act, 18 USC 1952(a)(3), despite the dismissal of these counts under the plea agreement and despite the defendant not admitting the elements of the offenses in his plea agreement. The defense submits that the presentence report has correctly resolved this issue involving grouping.

USSG 1B1.2(c) allows for a plea agreement that contains a stipulation that establishes the commission of additional offenses to be treated as if the defendant was convicted of those counts. Carter's plea agreement simply does not stipulate that he violated 18 U.S.C 1994(c), and therefore these counts should not be treated as if Carter pled to them.

In addition, Carter has objected to the allegations that the government relies upon in forming its argument that he "knew or was in reckless disregard" of the fact that force, fraud or coercion would be used on any one of these women in order to force them into prostitution. Specifically, Carter objected to Paragraph 27 because Carter did not see Cobb verbally abuse Victim 1 as it related to sex trafficking. Carter objected to Paragraph 48 as inaccurate because Victim 1 gave Carter the keys to her car to use, and Carter did try to give the car back to her, but she and her friend "Steve" had bought a new car together and Victim 1 would not return some of Carter's things that she had. In addition, for a portion of this time that Victim 1 claims Carter would not give her the car back, the summer of 2017, Victim 1 was in jail. It appears there were

---

[2] The defense believes that the government will be arguing at sentencing only that Victims 1 and 2, not Victim 3, should be grouped as violations of 18 USC 1594(c).

various reasons she was in jail, for violating her probation for child endangerment in Polk County Case FECR300477, and being charged in SRCR308319.  Victim 1 was also recently arrested for felony theft and forgery in Polk County case FECR322133.  Also, the excerpts provided do not include relevant phone conversations, including that Victim 1 told Cobb on the phone that Carter was not setting up plugs for her.

     Carter also objected to Paragraphs 79-81.  Victim 2 did come over to Carter's house.  She would text Victim A begging to come over.  Usually Victim 2 wanted to come over to smoke marijuana.  Sometimes, Carter would go pick her up.  There were times that Victim 2 wanted Carter to drive her somewhere, but he did not want to.  It was not because he was keeping her in some sort of nefarious way, however, as she alleges.  Carter did not have a driver's license and did not like driving if he could avoid it.  Victim 2 always wanted rides somewhere.  She was never taken anywhere against her will, but sometimes Carter would not agree to drive her places she wanted to go.  Carter never once pulled a gun out on Victim 2, and her statement to the contrary is a fabrication.  Victim 2 and Victim A's phone messages would show that Victim 2 was initiating contact and wanted to come over frequently.  In addition, the allegation that Carter somehow got Victim 2 into prostitution is not accurate.  Victim A had told Carter that Victim 2 prostituted before he ever met her.

     Carter also objected to Paragraph 114.  Victim 3 did come over to Carter's home and did see a gun in his safe (where he always kept it).  He did not, however, make the statement she attributes to him and did not otherwise coerce or threaten her.

     For all of these reasons, these counts related to Victims 1-3 should not be counted against Carter as violations of 18 USC section1594(c).  Instead, they should be considered exactly as contemplated by the plea agreement: as violations of the Travel Act because Carter aided the

women in posting advertisements.

### D. MINOR VICTIM B SHOULD NOT BE INCLUDED AS A GROUP.[3]

Carter also objects to the use of USSG 1B1.2(c) as a ground to assert that Minor Victim B should be considered a separate conviction, and a separate group. Carter did not, and does not, admit to the allegations made about Victim B. Carter's plea agreement simply does not stipulate that he violated the law as it pertains to Victim B, and therefore the counts should not be treated as if Carter pled to it. *See United States v. Davis*, 453 Fed. Appx. 452, 462 (5th Cir. 2011) (unpublished) (reversing application of multiple counts under USSG 3D1.4 for second minor victim because it was not part of the "count of conviction"); *United States v. Weiner*, 518 Fed. Appx. 358 (6th Cir. 2013) (unpublished) (conduct with other victims were not part of the relevant conduct so should not have been included as additional separate "pseudo counts" under 3D1.2 and 1B1.3.)

Carter also objects to being held responsible for Victim B because he was not involved in prostituting Victim B – her boyfriend was. Carter did not split any proceeds with her – her boyfriend did. Carter was not engaged in helping Victim B prostitute herself – her boyfriend helped her.

Victim B was likely engaging in prostitution. However, she fabricated who was responsible in order to protect her own boyfriend from prosecution.

### II. FACTUAL OBJECTIONS WHICH DO NOT AFFECT THE GUIDELINES, BUT COULD POTENTIALLY IMPACT FACTORS UNDER 18 USC 3553.

This case is rife with additional facts, multiple other defendants, and multiple victims. However, Carter simply was not aware, or responsible for all of the actions of all of the other

---

[3] The defendant believes the government will not be arguing this at sentencing. But, if the government does so argue, the defendant objects to the argument that he is responsible for Minor Victim B.

defendants. As such, Carter requests the Court remove the paragraphs from his presentence report that do not reflect upon his own conduct, or conduct he was aware of being conducted by others. Specifically, this includes Paragraphs 12, 13, 14, 15, 16, 21, 22, 23, 24, 26, 28, 29, 30, 31, 32, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47a, 47b, 49, 96, 97, 98, 99, 100, 101, 102, 103, 104, 116, 117, 118, 119, 120, 121, 122, 124, 125, 126, 127, 128, 130, and 131. Carter did not plead guilty to conspiracy, and did not plead guilty to, or admit to, any conduct related to these paragraphs. Under USSG §1B1.3(a), none of these acts were committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by Carter, nor were they within the scope of, in furtherance of, or reasonably foreseeable in connection with the count to which the Defendant has pleaded guilty. Much of this conduct had to have occurred while Carter was at work, unaware that they were going on. As such, the Defendant requests these paragraphs be removed from his presentence report as they do not apply to him and do not apply to his offense of conviction.

In addition, the presentence report contains allegations which Carter objects to that do not directly impact the sentencing guideline range, but which could impact the Court's opinion as to the appropriate sentence under section 3553. As such, he maintains his objections to these assertions and requests that the court not consider the assertions that are made, but can't be proved (and aren't true), in determining his sentence. Specifically, this includes:

- Paragraph 17. Cobb was not the one who asked Carter to post Victim 1's ad on Backpage, Victim 1 herself asked Carter to help her with an ad. Victim 1 did receive business from this ad, and Carter knew she was engaging in prostitution and helped her by creating the ad. He did not "manage calls" as the women were the ones talking on the phone when calls came in.

- Paragraph 18. Carter did not know Cobb was "making" Victim 1 go do commercial sex acts, nor did he know anything about the gun Cobb had or the $300 surrounding the gun. Carter did help set up Victim 1's ad online by posting the ad for her.

- Paragraph 25. Carter never saw Cobb hit Victim 1 in front of him.

- Paragraph 33. Cobb was the one who wanted the specific rates for the prostitution, not Carter.

- Paragraph 34. Carter agrees that Cobb probably said this in a proffer session, but Cobb's proffer information was not all true. Instead, Cobb tried to place blame on others for his actions in his proffer. Carter objects to the Court relying on Cobb's statements made out of court that implicate Carter as they were not all true.

- Paragraph 35. Carter helped set up the ads for Victim 1. He did not, however, arrange all of the calls. Carter does not know how much Cobb made from Victim 1, but Paragraphs 33 and 35 do not match each other. Victim 1 said she had to make $2000 a day over a 3 month period, and Cobb said he only made $10,000. These numbers indicate that one of the individuals was not being truthful. Carter was not paid money from the tricks, but was paid, at times (but not always) for helping with ads.

- Paragraph 38. Victim 1 has never been to Carter's house, to Carter's knowledge and memory. Carter left the gun at his house, in a safe, he did not carry it on him. So, there was no opportunity for Victim 1 to have ever seen a gun.

- Paragraph 47c. Carter never told Victim 1 that he was going to take trips to Atlanta with Coleman and that they were going to pimp her out. There is a jail

11

call where Carter is asked to take care of it and Carter says no.

- Paragraph 50. Cobb's contact to Victim 1 during this case was an attempt for Victim 1 to blame Carter, rather than Cobb, for Cobb's activities. Cobb continued to try to blame Carter for things that Cobb did, rather than Carter.

- Paragraph 51. Carter did not recruit Victim 10 to prostitution. She was already involved in it, as well as involved in other major crimes. (See, FECR315049, pending robbery first degree charges and FECR314548, pending eluding with injury, owi, drugs, and operating vehicle without owner's consent charges). She continued these crimes after Carter's arrest, see, e.g. AGCR320700, theft charges. Victim 10 worked with Coleman.

- Paragraph 52. Victim 10 did not work for Carter. Carter never said she had to work for him to give her a ride. He did however give her a ride once when she was walking in bad weather.

- Paragraph 53. Carter never saw Cobb beat Victim 1 or Victim 10.

- Paragraph 54. This did not happen. Victim 10 did tell Carter she was in an altercation with Alonzo, not Coleman, but Carter did not witness it.

- Paragraph 55. Carter objects to the characterization that these women were "working for him." He was involved in helping set up ads online for these women. He stopped messing with them or helping them with ads when Cobb got incarcerated, which was before South Dakota, not after as reported.

- Paragraph 56. Carter objects to the phrase "worked for" for both Victim A and Victim 10. He set up ads for them.

- Paragraph 57. Carter did not know Victim A was under the age of 18. She told

him a different age, had an id that she used that said she was older, used a different birthdate in front of him, and did not go to school daily. He did plead guilty, however, because the statute of conviction did not require him to "know" she was under 18, but that he recklessly disregarded her age after having a reasonable opportunity to observe her. Carter spent a lot of time with Victim A and so he had that reasonable opportunity to observe her.

- Paragraph 58. Carter objects to the assertion that he "regularly" physically assaulted Victim A. The two did get into an argument at one point in 2016 because Victim A had stolen from Carter. The argument was not about prostitution, and only the two of them were present for the altercation. Victim A did show pictures to people after that altercation, but no one witnessed it as they reported to law enforcement. After that altercation, the two stopped speaking for a period of time, before reconciling. Carter never pushed Victim A out of the car. One time Victim A did jump out of Carter's moving car as he was pulling over.

- Paragraph 59. Carter did not use Victim A to recruit other girls. Victim A recruited them on her own.

- Paragraphs 60-75. Victim B's story to law enforcement is not true. Carter did not recruit her, or set up her tricks. Victim B said it was Carter, probably to protect her boyfriend who was the one actually assisting her in prostituting. Carter received no money from Victim B's prostitution and did not know how old she was. Victim B did go to Omaha with Victim A and Carter, but she has omitted the fact that Victim B's boyfriend went with them and he set up her deals, not Carter. Victim B never saw Carter with a gun in his car as he did not drive

around with it. He had a gun in a safe in his house.

- Paragraph 76. Victim 2's foster parents were in Ames, but she frequently stayed with her sister in Des Moines.

- Paragraph 78. Carter objects to this characterization that he solicited Victim 2 into prostitution. Victim 2 had engaged in prostitution before meeting Carter.

- Paragraph 83. Victim 2 would not have been confused about what was happening as she was experienced in prostitution.

- Paragraph 89. Carter set up Victim 2's ads, like he did for other people. This paragraph is inconsistent with her prior report (Paragraph 84) that Carter kept "all" the money, because here she claims that is not true and he spent money on her. Almost all of the money made by the women was spent on the women, for hotels, food, clothes, ads, etc. The characterizations that Carter was keeping all of the money for himself is not accurate. Also the implication that he was forcing someone into prostitution is not accurate.

- Paragraph 91. This was not accurate. Victim A stayed with Carter at his house frequently and his mom made food every day. Victim A frequently ate there, knew she could come over and eat anytime, and always had food.

- Paragraph 92. Carter did not know that this happened and was not there when it happened.

- Paragraph 93. Carter did not say these things. He did not even talk to Victim 2 very much.

- Paragraph 94. This is not accurate. Victim 2 was a woman and knew how to dress herself.

- Paragraph 95. It is worth noting here that Victim 2, who claims she was held hostage and was terrified of Carter came back to his house willingly (because her claims were not true). Carter does not know what his mom said to Victim 2, but this conversation was after Carter's house had been raided and individuals involved in prostitution were getting attorneys. Of note, this is when Carter learned Victim A was underage because she was sent to Woodward Academy.

- Paragraph 96. Victim 3 previously stated she was coming to Des Moines for a baby shower, but this Facebook message showed her statement to law enforcement wasn't true.

- Paragraphs 96-102 omit the fact that Singleton had asked Carter to go get Victim 3 and Carter refused.

- Paragraph 105. This paragraph is true, but it also contradicts what Victim 3 said to law enforcement because she told them that Carter was the one who picked her up (but he did not, Victim A did).

- Paragraph 106. To the extent this implies Carter reserved the hotel for Victim 3, he did not.

- Paragraph 107. Carter did help Victim 3 post ads on Backpage, as he did with other women. Carter did not "handle the calls" however, Victim A and Victim 3 did. Johns do not speak to men on calls, they speak to women.

- Paragraph 108. It is not true that Carter took the money. Victim A bought the hotel and made Victim 3 split the cost with her. Most of the money the two made went to the hotel room. Victim 3 gave money to Victim A for these expenses.

- Paragraph 109. This message demonstrates that Singleton, not Carter, got money.

15

- Paragraph 110. Carter does not know how much money Singleton got, but Carter did not receive any money from Victim 3, he only spent his own money on her.

- Paragraph 111. Carter was not there and does not know if this is true.

- Paragraph 112. Carter did talk to Victim 3 about buying hygiene products because she had everything stolen and had no money. Carter did buy her items with his own money and bought her a bra. She spent her own money that she had made doing tricks buying clothes at Walmart. To the extent that Victim 3 did not have all of the things she wanted to buy, that was not the fault of Carter. He bought her things and spent money helping her. He was not the reason that she did not have money and he did not get money from her.

- Paragraph 113. Carter did buy Victim 3 food at times, but the implication is that somehow he was responsible for feeding her and buying her everything she didn't have. Carter did not recruit her, did not get money from her, and was not her guardian in any way. He did help her some, but the fact that he did help her should not be turned around into saying he did not help her enough.

- Paragraph 115. Carter did not "give" Victim 3 to Ronzell as she didn't "belong" to anyone. He was tired of paying for everything for her, and Ronzell did ask her if she wanted to work for him. (Of note, this was previously reported to law enforcement that Carter "sold" Victim 3 to Ronzell, which was not true). Carter did take Victim 3 over to Ronzells when he went over there, where Victim 3 met a friend of Ronzell's that she was flirting with and she left with him. Before Carter left the house, he asked Victim 3 if she wanted to stay there with her new friend and she said yes. Ronzell had a larger house than Carter and Carter did not

have room to offer to let her stay at his house.

- Paragraph 117-122. Carter does not know what happened after he left Victim 3 at Ronzell's house.

- Paragraph 123. This is not true. Carter did not tell her she needed a quota. Carter never said he would pay for her to get back home. Carter did not take her money. Victim 3 had her own money and she bought stuff with it.

- Paragraph 129. Victim 3 did not make money with Carter because her money went to the hotel rooms and her own spending. Carter also did not make money. It is true that Victim 3 was taking Victim A's cigarettes and marijuana and smoking it.

- Paragraph 133. Carter objects to the characterization of this conversation as him trying to get her to prostitute for him. Victim A had a job, and a paycheck, which she mentions in the call, and he was asking for money so he could continue to make phone calls. He also asked her to help him out in the sense that she knew the truth about some of the situations that the other witnesses were falsely reporting about him.

- Paragraph 135. Carter objects to the characterization that he "used Victim A" to recruit others because Victim A was engaged in prostitution before Carter was involved, and she recruited people on her own. Carter did not supply all of these drugs. He smoked marijuana and would sometimes share it. He did not carry a firearm, he left it in a safe. He was not physically abusive or demeaning to the victims. He assisted them, when asked, in posting ads online. He did get into the altercation with Victim A, but was not otherwise abusive. Carter did provide food

      to people when they needed it, but he did not prevent them from getting food, nor was he under some sort of responsibility to provide food to people. He did frequently give food to people. He did not require Victim 3 to make a certain amount of money and did not get money from her. He instead spent money on her. He did not get a large share of the proceeds.

- Paragraph 264. The defendant did not entice or recruit anyone into prostitution. He assisted, when asked, in posting ads on online forums. He did not engage two minors in prostitution, but he did assist one, Victim A, and he did let her stay with him at his house. He did not use the firearm or display it in a threatening manner. He did not degrade them. He did not withhold food or hygiene items. He did not physically abuse Victim A (with the exception of one altercation). He did not physically and emotionally coerce anyone.

Carter also requests that the Court consider that these women engaged in prostitution before meeting him, and after his arrest. The presentence report inaccurately implies that Carter caused women who had never engaged in prostitution before to start selling themselves. This is simply not true. Many of these victims are still out prostituting on their own currently. Many of these women also have picked up additional criminal charges, or were trying to get out of pending criminal charges, when these reports were made to law enforcement. The criminal histories, and history of prostitution before Carter knew the women involved is relevant to the offense. The presentence report omits relevant details about the motivations for the victims from coming forward and the victims themselves leave out their own histories of prostitution prior to the offense. Carter believed that all of the women that were involved in this prostitution business were doing it willingly. The versions of the events were reported by these women in an

inaccurate manner, perhaps as part of trying to minimize their own culpability. As such, Carter respectfully requests the circumstances of the reporting, the pending serious criminal charges against some of the victims, and the prior and subsequent criminal conduct of them be considered as part of the story, so as to make it more accurate. Carter admits that he helped them engage in prostitution, posted ads for them, made money off of posting the ads, and, of most consequence, that he helped and harbored Victim A, who was a minor, engage in prostitution. His admissions are significant and result in a mandatory minimum sentence. He was not, however, engaged in forcing women into prostitution against their will.

### III. SENTENCING FACTORS UNDER 18 USC 3553.

While the offense conduct is serious, warranting serious consequence, that conduct is already taken into account in the mandatory minimum sentence, and the guideline range. Carter's history and characteristics, on the other hand, demonstrate that a sentence of 120 months in prison is sufficient, but not greater than necessary.

Carter grew up with both parents serving significant prison time. He helped raise his siblings and has a strong relationship with them as a result. The letters provided to the Court by his family show a different person than the one characterized by the presentence report. Carter has always been supportive of his family, and is cherished by them. He is funny, helpful, and committed to his family.

In October, Carter's son was born. He has maintained a relationship with him and his son's mother despite being incarcerated.

Carter was employed as a customer service representative prior to his arrest in this case. His coworkers liked him and support him, as evidenced by the letters submitted to the court. He had this job for seven months prior to his arrest. This shows that he is capable of making a living

to help support his family.

      Carter has minimal criminal history and is in criminal history category I. This is his first felony charge and the first time he will be in prison. Unless something changes with the government shutdown soon, he will not be able to see his family when he initially goes to prison, classes and programming will possibly still be shut down as the BOP recovers from furloughs and weeks without pay and funding for many activities. See https://www.themarshallproject.org/2019/01/07/what-the-government-shutdown-looks-like-inside-federal-prisons?ref=hp-1-111 (last accessed 1/11/19). Carter will likely be classified as a sex offender for the rest of his life. A 10 year prison sentence is sufficient to punish his actions in this case.

Respectfully submitted,

                                                            **/s/Angela L. Campbell**
Angela L. Campbell AT# 0009086
DICKEY & CAMPBELL LAW FIRM, P.L.C.
301 E. Walnut St., Suite 1
Des Moines, Iowa 50309
PHONE: 515.288.5008
FAX: 515.288.5010
E-MAIL: angela@dickeycampbell.com

The undersigned hereby ROOF OF SERVICE certifies that a true copy of the foregoing instrument was served upon each of the attorneys of record, or the parties if unrepresented, at their respective addresses disclosed on the pleadings.

By:    \_\_\_\_\_ U.S. Mail      \_\_\_\_\_ Fax
          \_\_\_\_\_ Courthouse Mail  \_\_\_\_\_ Hand
          \_\_\_\_\_Certified Mail      x  Other

Signature:    /s/Angela L. Campbell

Date:    1/11/19