IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | Criminal No. 4:18-cr-053 |
| v. | ) | |
| | ) | GOVERNMENT'S SENTENCING |
| MARK PHILLIP CARTER II, | ) | MEMORANDUM |
| | ) | |
| Defendant. | ) | |
| | ) | |

COMES NOW the United States of America, by its undersigned counsel, and provides the following memorandum for the sentencing in this matter.

## TABLE OF CONTENTS

I.   Background and Sentencing Issues ................................................................... 1

II.   Factual Objections ............................................................................. 2

III.   Appropriate Sentence in this Case.................................................................. 18

V.   Conclusion ......................................................................................... 22

## I.  Background and Sentencing Issues

Defendant Mark Phillip Carter II was charged with several sex trafficking offenses involving two minors and three adults, and with possessing a firearm during the commission of a sex trafficking offense. On September 26, 2018, Carter pled guilty to one count of sex trafficking of children (Count 8). (Dkt. 280.)

Sentencing is scheduled for Wednesday, January 16, 2019 at 1:00 p.m. The parties have worked to narrow the remaining issues, but a number of factual and guideline issues remain. Due to the complexity of the case, the government has

included at Attachment A a list of proposed factual findings that it submits would resolve the outstanding guideline issues. The government's proposed guideline calculation is included as Attachment B. The remaining guideline issues are: (1) whether a two-level upward adjustment for undue influence applies for Minor Victim A; (2) whether a two-level upward adjustment for the commission of a sex act applies for Minor Victim A; and (3) whether Victims 1 and 2 should be attributed as sex trafficking victims, which would result in a three level upward adjustment. Due to the scope of Defendant's conduct, particularly the number of victims involved in the offense, the government submits that a term of imprisonment of no less than 151 months is sufficient but not greater than necessary, regardless of the Court's findings on the guideline calculation.

## II.  Factual Objections

Defendant objects to nearly every paragraph in the offense conduct section of the PSR. These facts are relevant to the guideline determinations, which are also largely objected to, and the ultimate sentence in this case. The government has set forth in Attachment A a list of factual findings that support the government's requested guidelines. Below is a summary of those factual findings, with an explanation of how the government's proffered evidence supports those findings, and how the government's requested guideline calculations fall from those factual findings. Due to the complexity of the case and the volume of objections, the government is not seeking to prove up every paragraph of the PSR line by line, but instead the essential, readily provable facts that support the guideline adjustments

2

in this case.

**A. Minor Victim A (███████████)[1], Group One**

   **1. Undue Influence (PSR ¶ 144)**

The PSR applies a two count adjustment for "undue influence" towards Minor Victim A (████████) because Carter used physical violence towards her. (PSR ¶ 144.) Carter objects to this adjustment

   i. Proposed Factual Finding 1: Carter was physically violent towards Minor Victim A (████) on at least one occasion.

No fewer than four witnesses have stated that Carter was physically abusive towards Minor Victim A. Several witnesses who have testified or been interviewed by law enforcement have all stated that Carter was violent towards Minor Victim A and thus corroborate one another, and support a factual finding by a preponderance. It is also noteworthy that they do not describe Carter as hitting anyone else; their statements do not exaggerate or dramatize his conduct.

████████████ (Victim 2) testified under oath, in grand jury, that Carter pushed ████ (MV-A) out of a car shortly before she and ████ (V-2) went to a call at a client's apartment. Carter pushed ████ (MV-A) out of the car because he wanted her to "go on a date with this guy and she didn't want to do it." (GX 1 at 18-19.) Carter wanted ████ (MV-A) to dress up for a commercial sex act, and ████ (MV-A) did not want to, so Carter pushed her out of the car. (*Id*.) Carter himself admits

---

[1] Due to the number of victims and disputed factual findings, the government submits a sealed sentencing exhibit that contains the victims' actual names and the numbering used in the PSR. A redacted version of this memorandum will be filed publicly.

that ███ (MV-A) once "jumped" out of his car while it was moving. (Dkt. 346 ¶ 21.) ███ (V-2) further testified that Carter would regularly push ███ (MV-A), "grab her by the neck sometimes . . . when she wasn't listening to him." (GX 1 at 19.) The government anticipates that ███ (V-2) will testify at sentencing to this fact consistently with her grand jury testimony.

███████ (Minor Victim B) also testified in grand jury that although she had not seen Carter hit ███ (MV-A), she had seen photographs of it. (GX 2 at 29.) The photograph showed: "Her face. Her eye was black, literally, like, black, it was swollen shut; her nose was bleeding. That was about it--and her lip was busted as well." (*Id.*) ███ (MV-B) went on to recall that ███ (MV-A) and Carter got into a physical altercation over a regular client. (*Id.* at 32.) This is partially corroborated by Carter himself, as he admits that he and ███ got into an "argument" and that "Victim A did show pictures to people after that altercation . . . ." (Dkt. 346 at 21.)

Carter's co-defendants have also stated in proffers that Carter hit ███ (MV-A). Julyen Singleton disclosed to law enforcement that ███ (MV-A) had told him that Carter was physically abusive. (GX 3 at 1.) Stephen Cobb also stated that he saw Carter physically assault ███ (MV-A). (GX 5 at 6.)

### ii. The 'undue influence' adjustment applies.

A two level adjustment for undue influence applies if Carter "otherwise unduly influence[d] a minor to engage in prohibited sexual conduct". USSG §2G1.3(b)(2)(B). "In determining whether subsection (b)(2)(B) applies, the court should closely consider the facts of the case to determine whether a participant's influence over the

minor compromised the voluntariness of the minor's behavior." App. Note 3(B). As set forth above, Carter was engaged in a physically violent relationship with ███ (MV-A). Carter used a combination of violence and affection to control her, and to get her to engage in sex acts for his own financial benefit, which distinguishes this offense from others in which physical violence or the threat of violence is not used upon the minor victim. The adjustment applies. Even if the adjustment did not apply, this is an aggravating fact that would otherwise warrant an upward variance.

### 2. **Minor Victim A (███), Group One: Commission of a Sex Act**

The PSR applies a two count adjustment pursuant to USSG § 2G1.3(b)(4)(A) because the offense involved the commission of a sex act or sexual contact. Carter does not object to the statement in the PSR that Minor Victim A engaged in sex acts for him throughout June 2017 (PSR ¶ 90.) Carter admitted in his plea agreement to transporting her to hotels and motels to engage in commercial sex acts, and receiving proceeds from those sex acts. (Dkt. 280, ¶ 8.) Carter objects to this adjustment. (Dkt. 346 at 64.) The guideline contains a distinction between a sex act and a commercial sex act, which leads to some confusion. The reason for this adjustment is that the commission of an actual sex act is not inherent in an 18 U.S.C. §1591 offense (as it is in the other statutes to which these guidelines apply), because an actual commercial sex act need not be completed. See, e.g., *United States v.* Jungers, 702 F.3d 1066 (8th Cir. 2013).This happens in cases with undercover officers, for example. Certainly a case where a minor actually engages in a sex act is more serious than one in which that sex act never takes place. Circuit courts have found the adjustment is not

duplicitous and have found it applies in circumstances, like here, where a commercial sex act took place. *United States v. Hornbuckle*, 784 F.3d 549 (9th Cir 2015); *United States v. Willoughby*, 742 F.3d 229 (6th Cir 2014). The guideline squarely applies.

**B. Minor Victim B (███████████████), Group Two**

Carter objects to including ███████████, Minor Victim B, in his PSR at all. ███████(MV-B) testified at grand jury that when she was 17 years old, ██████(MV-A) recruited ██████ (MV-B) to prostitute for Carter. ████████ (MV-B) testified that she split the proceeds of commercial sex acts with Carter, and that this lasted over a period of approximately one month. She did not recall telling Carter her age. (*See generally*, GX 2.) Carter admits to traveling out of state with ██████ (MV-B) and ███████(MV-A) for the purpose of prostitution, but argues that he did not set up her ads or collect money from the sex acts. (Dkt. 346 at ¶ 23.) He argues that ████████(MV-B)'s boyfriend was soliciting her for prostitution, while ██████ (MV-B)told law enforcement that she had broken up with her boyfriend prior to her involvement with Carter, and that's why she agreed to work for Carter. (GX 6.)

The government is not seeking to prove up the factual circumstances surrounding ██████(MV-B), or the guideline adjustments proposed by the PSR. The government has been unable to locate ██████ (MV-B) for her testimony. Her involvement with Carter was limited to himself and ██████ (MV-A), and there is therefore less witness testimony to corroborate her statements than with the other victims. Therefore, the government is not pursuing this adjustment. Carter's admission that he traveled out of state with another minor for the purposes of

prostitution is relevant to the ultimate sentence in this case.

### C. Victim 1 (███████████), Group Five

The PSR attributes ████████ (Victim 1) to Carter as a victim of the Travel Act, applying an offense level 14, which does not ultimately increase Carter's offense level. (PSR ¶¶ 157-162, 175.) The government objects to this calculation. Carter entered into a conspiracy with Stephen Cobb to traffic ████ (V-1) from March 2017 through July 2017, and did in fact traffic her. This information is corroborated by ████ (V-1)'s grand jury testimony, Cobb's proffer statements, jail calls, text messages, and other witness testimony.

> i. <u>Proposed Factual Finding 2: Between March 2017 and April 2017, Carter knowingly transported, obtained, and provided Victim 1, and benefitted financially and received something of value from the trafficking of Victim 1, in that Carter advertised Victim 1 on an online escort website, communicated the locations of commercial sex acts to Stephen Cobb in which Victim 1 was to engage in commercial sex acts, and received proceeds from those sex acts.</u>

Carter does not object to the fact that he advertised ████████████ (Victim 1) on Backpage.com (an online escort website), and communicated the locations of 'plays', or commercial sex acts, to Cobb that he arranged for Victim 1. (PSR ¶¶ 19-20, Dkt. 346.) Carter sent Cobb text messages that clearly show Carter arranged the dates and places for commercial sex acts. For example, Cobb asked Carter: "Is he still texting you" and Carter responded, "Yes." (PSR ¶ 20; GX 4.) Another time, Carter told Cobb: "I'm talking to play." (GX 4.) Surrounding text messages make clear that they

were talking about commercial sex acts, or 'plays'. (PSR ¶ 20; GX 4.)[2] Carter communicated locations for the sex acts, and the wishes of the johns (e.g. "He wants two packs of condoms.") (GX 4.) By advertising ███ (V-1), receiving calls on her behalf, and communicating those calls to Cobb, Carter was knowingly obtaining and providing Victim 1 for commercial sex acts.

Carter also benefitted financially by ███ (V-1)'s prostitution, as he received 20-30 percent of what the johns paid as a fee for posting her under his Backpage account. Carter argues that he "was not paid money from the tricks, but was paid, at times (but not always) for helping with the ads." (Dkt. 346.) Carter thus concedes that he benefitted financially from the commercial sex acts. The requirement that he benefit financially from participation in a "venture" (involving at least two people) which trafficked ███ (V-1) is also clearly met, due to co-defendant Cobb's involvement in providing and transporting ███ (V-1).

Carter's involvement in the trafficking of ███ (V-1) is corroborated by the victim's sworn testimony. ███ (V-1) testified under oath in grand jury that Carter "was the person that set everything up as far as me meeting the clients. He would tell us where to go, who to meet with." (GX 6 at 10.) She further testified that Carter posted her ads on Backpage.com, that Carter received a percentage from the commercial sex acts, and that both Carter and Cobb transported her to commercial sex acts. (*Id.* at 10-12.)

---

[2] The phone number for Carter in GX 4 begins with 310. The number with the name "Snow" is Victim 1.

Cobb also stated in his proffer interview, and admitted in his plea agreement, that Carter would set up the dates with the john who would contact Carter's phone line for a commercial sex act, and communicate the dates to Cobb. (GX 5 at 2; Dkt. 231 (Cobb Plea Agrmt.) ¶ 8.) It also just makes sense for Carter to receive the calls and texts from clients, as he is posting the ads with his number, and it allows them to better control and monitor V-1. Cobb also admitted to giving Carter a percentage of 20 to 30 percent of the calls that Carter arranged. (GX 8; Dkt. 231 (Cobb Plea Agrmt.) ¶ 8.) This information is further corroborated by ▮▮▮▮▮▮▮▮ (Victim 10), who described Carter as having his own "line" on which he would take calls and arrange commercial sex acts for ▮▮▮ (Victim 1) and ▮▮▮▮▮ (Victim 10). (GX 9; PSR ¶ 21.) In text messages to Cobb, Carter references his one-third percentage for commercial sex acts. (PSR ¶ 21 ("Take my hoe to the play get that third.").) Furthermore, a defendant in a separate case told law enforcement in a proffer that Cobb paid Carter a percentage for posting ▮▮▮ (V-1). (GX 12 at 4.)

ii. <u>Proposed Factual Finding 3: Carter was in reckless disregard of the fact that coercion would be used to cause Victim 1 to engage in a commercial sex act. Specifically, Carter knew that Cobb was verbally abusive to Victim 1, and Cobb told Carter to keep her car as an attempt to try to get her to engage in commercial sex acts.</u>

The evidence shows by a preponderance that Carter knew that Cobb was at least verbally abusive to ▮▮▮ (Victim 1), and knew that Cobb used coercive means to compel her to engage in commercial sex acts. ▮▮▮ (V-1) testified under oath that Cobb called her derogatory names such as "bitch, whore, nothing positive ever," and that he did so in front of Carter. (GX 7 at 14-15.) ▮▮▮▮▮ (Victim 10) has told law

enforcement that Cobb frequently physically assaulted ██ (V-1) in front of Carter. (GX 9 at 3.) Cobb himself has admitted to using verbal and physical abuse towards ██ (V-1), which he clearly made no effort to hide, as he spoke to and about her in a violent and demeaning manner. (PSR ¶¶ 29 (text messages), 49 (jail calls to Coleman); Dkt. 231 (Cobb Plea Agrmt), admitting to physically assaulting V-1, threatening V-1 with violence, and verbally demeaning and insulting V-1.)

The Court need not rely on witness testimony alone for this finding, because the evidence is clear from the defendants' own conversations, recorded on jail calls. Carter knew that Cobb was using coercion to get ██ (V-1) to prostitute because Cobb told Carter what he was doing on jail calls after Cobb was arrested in May 2017. On May 22, 2017, Carter told Cobb that ██ (V-1) told Carter she was treated as a "piece of shit" and wants to stop working for them. (GX 11-A.)[3] Carter admits that he was trying to keep ██ (V-1) working for him, "but she's not cooperating . . . she just wants to get her stuff and she's done." (*Id.*; PSR ¶ 48a.) Carter: "She's just lost right now, she's trying to get out of it." (GX 11-A.) In response, Cobb repeatedly tells Carter, "don't let her win." (*Id.*) "Do not let this cunt win. If she's not working, you niggers make her feel it . . . **I want her dead or in the county [jail] if she's not trying to listen**." (*Id.*; PSR ¶ 48c.)

Cobb repeatedly tells Carter to keep V-1's car to try to compel her to prostitute for them. Cobb: "We're going to need that income. I'm not going to let her get off that

---

[3] Copies of these excerpts will be provided to the Court and defense counsel.

easy." (GX 11-B.) "She's going to do anything to try to keep that car." (*Id.*) Cobb tells

Carter the way to compel V-1 to work is to hold her clothes and the car hostage, and

to tell her that if she works to make $1,000 or $500, then she can get them back. (*Id.*)

Carter certainly does not sound surprised to hear Cobb refer to ████ (V-1) as a "cunt"

and a "ho," nor does he seem surprised by Cobb's threats of violence and financial

control. Instead, Carter agrees to help. (PSR ¶ 48; GX 11-A, 11-B.)

████ (V-1) testified that Carter kept her car in an effort to get her to continue

to work for him. (GX 8 at 22.) According to ████ (V-1), "I tried getting it back from

him [Carter] but he told me the only way I could get it back is if I would come back

and work with him –or work for him." (*Id.*) Several witnesses saw Carter and ████

(MV-A) driving ████ (V-1)'s car throughout the summer of 2017, corroborating that

Carter carried out Cobb's wishes. (GX 1 at 6; GX 2 at 9; GX 10 at 13.)

> 2.  <u>A base offense level of 34 applies to Victim 1 because Carter entered into</u>
>     <u>an agreement with Cobb to traffic Victim 1 coercion, and in fact did so.</u>

If the Court finds facts 3 and 4 listed above, then there is also a sufficient

finding that Carter conspired with Cobb to traffic ████ (V-1), and/or that he actually

trafficked her, such that a base offense level of 34 applies, not 14. USSG § 2G1.1(a)(1).

The elements of conspiracy to engage in sex trafficking by force, fraud, or

coercion, are:

(a)    Defendant and another person made an agreement to commit the crime

of sex trafficking by force, fraud, and coercion; and

(b)    Defendant knew the unlawful purpose of the agreement and joined in it

willfully, that is, with the intent to further the unlawful purpose.

11

The elements of sex trafficking by force, fraud, or coercion, are:

(a)     From in or about March through in or about July 2017, Defendant knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained[4] by any means Victim 1; or benefitted, financially or by receiving anything of value from participation in a venture which has engaged in an act described above;

(b)     Defendant did so knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or any combination of such means would be used to cause Victim 1 to engage in a commercial sex act; and

(c)     The offense was in or affecting interstate commerce.

The term "coercion" as used in 18 U.S.C. §1591 includes threats of serious harm to or physical restraint against any person; any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or the abuse or threatened abuse of law or the legal process. 18 U.S.C. §1591(e)(2). The term "serious harm," means any harm, whether physical or nonphysical, including psychological, financial, or reputational

---

[4] 18 U.S.C. §1591(a)(1) also includes the verb "advertising." That verb alone requires a higher mens rea; if the government proves only "advertising," it must prove the defendant knew that force, threats of force, fraud, or coercion would be used. For every other verb, the government must only prove reckless disregard. To simplify matters, the government is thus proceeding under the other verbs and reckless disregard for the requisite mens rea.

harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm. 18 U.S.C. §1591(e)(4).

As to Victim 1, Factual findings 3 and 4 establish the first two elements of the offense, particularly as to the element of coercion. The offense also affected interstate commerce because Carter admits that he posted V-1 online (using the internet), in addition to the fact that hotels and motels were used, and telephones were used to arrange the sex acts.

**D. Victim 2 (███████████), Group Four**

The PSR attributes ████████████ (Victim 2) to Carter as a victim of the Travel Act, applying an offense level 14, which does not ultimately increase Carter's offense level. (PSR ¶¶ 163-168, 175.) The government objects to this calculation, because the evidence shows by a preponderance that Carter trafficked ██████ (V-2) in or about June 2017. The government anticipates that ██████ will testify at the sentencing hearing. She previously testified in the grand jury. Her statements are corroborated by other witness testimony in this case, as set forth below.

1. <u>Proposed Factual Finding 4: In June 2017, Carter knowingly transported, obtained, and provided Victim 2, and benefitted financially and received something of value from the trafficking of Victim 2, in that</u>

<u>Carter advertised Victim 2 on an online escort website, transported
Victim 2 commercial sex acts, and received proceeds from those sex acts.</u>

Carter admits to advertising ▮▮▮ (V-2) on Backpage.com. Carter claims
that ▮▮▮ (V-2) and ▮▮▮ (MV-A) handled calls and addresses themselves. (Dkt.
346 ¶ 28.) This is inconsistent with ▮▮▮ (V-2)'s testimony, and the testimony of
other victims. ▮▮▮ (V-2) testified that Carter arranged calls with the johns. (GX 1
at 11.) ▮▮▮ (V-2) testified that Carter at times drove her to the sex acts, and at
others provided the address to ▮▮▮ (MV-A), who would drive her there. (GX 1 at 24.)
▮▮▮ (V-2) did not even know that Carter was advertising her on Backpage (*id*.); it
is only logical that the person who is posting the ad would be the person fielding the
texts sent to the number on the ad. While Carter argues that the women handled the
calls themselves, several witnesses have stated that Carter set up calls with the
johns, further corroborating ▮▮▮ (V-2)'s testimony. (GX 8 at 8-9, 13-14, 17, 31
(▮▮▮ / MV-B); GX 9 at 2 (▮▮▮/V-10)). *See also* discussion of Victim 1, above.

Carter benefitted financially and received something of value from the
commercial sex acts by receiving proceeds from those acts. Carter participated in a
"venture" that trafficked ▮▮▮ (V-2), in that both he and ▮▮▮ (MV-A) transported,
obtained, and provided ▮▮▮ (V-2). ▮▮▮ (V-2) testified that Carter directed her
to give the money to him after she engaged in commercial sex acts. (GX 1 at 10, 14-
15, 17, 22-23.) ▮▮▮ (V-2) estimated that this occurred nearly every day in June
2017. (*Id.* at 23.) Carter would give her small amounts of food from gas stations;
otherwise, ▮▮▮ (V-2) would get food at ▮▮▮ (MV-A)'s mother's house, or from her

14

sister. (*Id.*)

████ (V-2) statements are further corroborated by the sworn testimony of both Minor Victim B and Victim 3, who saw ████ engaged in commercial sex acts for Carter during this time. (GX 9 at 17-18; GX 10 at 14-15, 17, 28.)

      2.  <u>Proposed Factual Finding 5: Carter was in reckless disregard of the fact that coercion would be used to cause Victim 2 to engage in a commercial sex act. Specifically, Carter gestured with a firearm towards Victim 2 in a threatening manner when she told him she wanted to leave his home.</u>

In grand jury ████ (V-2) testified that, on one occasion, Carter pulled out a gun on her when she wanted to go home. (GX 1 at 19-20.) ████ (V-2) testified that they were in his basement and she told Carter she wanted to go home because her blood sugar was extremely low, and she is diabetic. (PSR ¶ 76.) Carter told ████ (V-2) she was not going home, and pulled his gun out at her. (GX 1 at 20.) Carter gestured with the firearm, and told her "you're not going anywhere. Sit down." (GX 1 at 21.)

████ (V-2) description of Carter gesturing with a firearm, and keeping a firearm in his room, is corroborated by other witnesses and law enforcement. ████ (V-2) described how Carter had a safe in his room, which is where she thought he kept the gun. (GX 1 at 20.) On August 3, 2017, law enforcement officers recovered a Hi-Point C9 nine-millimeter pistol from a safe in Carter's room, located in the basement of his home. (PSR ¶ 82.) Other witnesses have described Carter with a firearm. ████ (MV-B) saw Carter with a black nine-millimeter gun that he kept in a safe in his room, and sometimes carried in his vehicle. (GX 2 at 30-31.)

Notably, ████ (V-3) testified under oath that Carter pulled out a gun

from a safe in his house in front of herself and ▮▮▮ (MV-A) and threatened, "This is what happens when bitches talk." (GX 10 at 41.)

>    3.   <u>A base offense level of 34 applies to Victim 2 because Carter trafficked Victim 2 by coercion.</u>

Factual findings 5 and 6 establish that Carter engaged in sex trafficking of Victim 2 by coercion, in that he, at a minimum, transported, provided and obtained Victim 2, and benefitted financially and received money by participating in a venture (that involved Carter and Minor Victim A), in reckless disregard of the fact that Victim 2 would be caused to engage in commercial sex acts by coercion. The offense also affected interstate commerce because Carter admits that he posted V-2 online (using the internet), in addition to the fact that hotels and motels were used, and telephones were used to arrange the sex acts.

In considering whether coercion would be sufficient to cause a person to engage in a commercial sex act, the Court may consider not only the cumulative effect of the defendant's conduct on the person but also the person's special vulnerabilities, such as any aspect of the person's age, background, station in life, physical or mental condition, experience, education, socioeconomic status, or any inequalities between the person and the defendant. In other words, the Court may consider whether the person was vulnerable in some way such that the defendant's actions would have been enough to compel a reasonable person of the same background and in the same circumstances as the person to engage in a commercial sex act.[5] In this case, ▮▮▮

---

[5] *United States v. Kozminski*, 487 U.S. 931, 948, 952 (1988) ("The vulnerabilities of

(V-2) background and current living conditions made her particularly susceptible to Carter and ████ (MV-A). She was diabetic, in the foster care system, and had just turned 19 years old. (PSR ¶ 76-77.) Carter provided her with marijuana (a fact that he does not object to), posted her online, threatened her with a firearm, and used physical violence towards ████ (MV-A) in front of ████ (V-2). All these facts show by a preponderance that Carter was, at a minimum, in reckless disregard that coercion would be used to cause her to engage in a commercial sex act.

### E. Victim 3 (████████), Group Five

The PSR attributes ████████ (Victim 3) to Carter as a victim of the Travel Act, applying an offense level 14, which does not ultimately increase Carter's offense level. (PSR ¶¶ 169-75.) Carter admits that he posted Victim 3 on Backpage.com for

---

the victim are relevant in determining whether the . . . coercion or threats . . . could plausibly have compelled the victim to serve."); *United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004) (explaining that "known objective conditions that make the victim especially vulnerable to pressure (such as youth or immigrant status) bear on whether the employee's labor was 'obtain[ed]' by forbidden means") (citations omitted); *United States v. Pipkins*, 378 F.3d 1281, 1297 n.12 (11th Cir. 2004) (identifying youth as a relevant special vulnerability); *United States v. Veerapol*, 312 F.3d 1128, 1131-32 (9th Cir. 2002) (explaining that in determining whether a victim's labor was obtained through coercion, jury "may consider such factors as 'evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities'") (citations omitted); *United States v. Alzanki*, 54 F.3d 994, 1002 (1st Cir. 1995) (affirming jury instruction directing consideration of whether victim "*reasonably believed* that she had no choice except to remain in the service of the [defendants]" and holding that "[i]t was entirely proper to instruct the jury to consider [victim's] background and experience in assessing whether her fears were reasonable") (emphasis in original).

the purpose of prostitution. (Dkt. 280 (Carter Plea Agrmt.) ¶ 8(h); Dkt. 346 (PSR Obj.) ¶ 43; PSR ¶ 107.) According to Carter, ███ (MV-A) got the hotel room, and took V-3's money for the room. (Dkt. 346 ¶ 44.) Carter admits that he knew that V-3 had everything stolen from her when she arrived in Des Moines, had no money, and thus should have known that she was engaging in commercial sex acts under some measure of duress. (Dkt. 346 ¶ 112.)

While Carter's involvement in the prostitution of ███ (V-3) is relevant under 18 U.S.C. §3553(a), the government is not at this time planning to seek to prove by a preponderance that Carter trafficked V-3.

### III. Appropriate Sentence in this Case

The government sets forth its proposed guideline calculation in detail in Attachment B to this memorandum. Based upon the foregoing, the government's position is summarized as follows:

| | |
|---|---|
| Base Offense Level: | 30 |
| Undue Influence: | +2 |
| Commission of a Sex Act: | +2 |
| Adjusted Offense Level (MVA): | +34 |
| | |
| Adjustment for 3 Victims: | +3 |
| | |
| Acceptance: | -3 |
| Total Offense Level: | 34 |

Criminal History Category: I

Guideline Range: 151 to 188 months.

The government recommends a sentence of no less than 151 months in this

case. The government submits that even if the Court finds that one or more of the adjustments do not apply, and that therefore Carter's guideline sentence is between the mandatory minimum 120 months and 151 months, that an upward variance to at least 151 months is appropriate due to the number of victims involved (whether they are considered travel act or sex trafficking victims) and scope of the conduct.

## A. Nature and Circumstances of the Offense

This offense is unquestionably serious. Carter seems to want to excuse his conduct by blaming the victims in this case, or by arguing the victims were engaged in prostitution before they met him. In other words, the "they're just hos" argument; they're damaged goods, you shouldn't believe them, and certainly shouldn't care. It is not an excuse, a defense, or a mitigating argument that a victim has engaged in prostitution prior to a defendant's involvement. Carter repeatedly argues that his victims engaged in prostitution before he was involved with them. First of all, if Minor Victim A or B were involved in commercial sex acts prior to Carter, that would make them *victims*; they were 16 and 17 years old at the time of the offense. But more importantly, it is irrelevant. As courts have recognized again and again, evidence of a victim's prostitution before or after the offense it is irrelevant to whether a defendant has trafficked her, and thus is not admissible in sex trafficking trials. *United States v. Roy*, 781 F.3d 416, 418-20 (8th Cir. 2015).

What makes Carter's conduct particularly aggravating is the depth of his involvement and the number of young female victims. Minor Victim A was 16 years old, and was clearly intimately involved with Carter, as several witnesses have described her as working for and with Carter. Carter's relationship with Minor Victim

A is not unlike that of his co-defendant and cousin Darren Coleman, and Sarina Williams, but Coleman and Williams were farther along, more sophisticated, and older. Through Minor Victim A, Carter was able to exploit additional young women he otherwise may not have had access to. Victim 2 turned 19 right when she met Carter. Victim 3 had turned 18 one month prior to coming to Des Moines. Minor Victim B was 17 years old. In just the Spring and Summer of 2017, Carter was involved in the prostitution of no less than six young women. (Victims 1, 2, 3, MV-A, MV-B, V-10.)

Carter's use of physical force and threats of force, and his knowledge of the violence of his co-defendant Cobb against V-1, also distinguishes Carter from other defendants such as Ronzell Williams and Breeanna Brown. His actions and mentality can perhaps be described as reckless and unfeeling than cold and deliberate; he just didn't care if he scared the victims, if they were threatened, or if they were harmed. He did not care if their clothing and car were stolen like Victim 1, if they were hospitalized like Victim 2, if they had no way to get home like Victim 3, or if they were a child, like Minor Victim B. He was not as calculating and sophisticated (and successful) as his cousin Coleman, but he was equally unfeeling to his victims.

## B. History and Characteristics of the Defendant

Carter is 27 years old. His personal history reveals no mitigating information that could begin to explain his involvement in these crimes. He has some limited, spotty employment history. (PSR ¶¶ 232-237.) He admits to regularly using marijuana and cocaine. (*Id*. ¶ 232-237.) He reports no significant mental health or gambling issues. (*Id*. ¶ 214-16.) According to Carter, he spent two years as a young

child in an abusive home between the ages of about 6 and 8. (*Id.* ¶ 195.) Carter enjoys a supportive family. (*Id.* ¶ 198 (His mother blames the victims for his offense: "the lifestyle was brought to him by victims."))

In addition to the extensive evidence noted previously that he was violent towards Minor Victim A, Carter's limited criminal history shows documented incidents of violence towards women. In 2015, Carter's girlfriend reported that he assaulted her; a warrant remains outstanding for his arrest due to failure to comply with orders of the court. (*Id.* ¶ 186.) The same year, Carter was observed by law enforcement yelling at a woman. (*Id.* ¶ 187.) Neither incident adds to his criminal history points. Carter otherwise has limited history of arrests or convictions, which is accounted for in his criminal history category I.

## C. Restitution, Victim Impact, Special Assessment, and Fine

In this case the government is not seeking restitution. No victim impact statements have yet been received; the government will update the Court and parties if any are submitted. Minor Victim A has never agreed to be interviewed by law enforcement, and the government has been unable to derive a reasonable estimate of restitution without her participation. By all accounts, Carter was an unsuccessful businessman. There was little money left from the trafficking after he sent victims out on very inexpensive calls, and used most of the money on hotel rooms, food, and drugs.

Due to Defendant's financial circumstances and anticipated future employment opportunities, the government is not seeking the $5,000 special

assessment, or a fine.

## IV. Conclusion

The government respectfully requests that the Court adopt the factual findings listed in Attachment A for the reasons stated in this brief and supported in its exhibits, apply the guidelines listed in Attachment B, and impose a term of imprisonment of no less than 151 months.

Respectfully submitted,

Marc Krickbaum
United States Attorney

By:  _/s/ Virginia M. Bruner_
Virginia M. Bruner
Assistant United States Attorney

U. S. Courthouse Annex, Suite 286
110 East Court Avenue
Des Moines, Iowa  50309
Tel:  (515) 473-9300
Fax:  (515) 473-9292
Email:  Virginia.Bruner@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2019, I electronically filed the foregoing with the Clerk of Court using the CM ECF system.  I hereby certify that a copy of this document was served on the parties or attorneys of record by:

|   | U.S. Mail | Fax | Hand Delivery |
|---|-----------|-----|---------------|
| X | ECF/Electronic filing | | Other means |

UNITED STATES ATTORNEY

By: s/ Virginia M. Bruner
    AUSA